Appeal No. 24-1594

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

ANDY KIM, in his personal capacity as a candidate for U.S. Senate, *et al.*,

Plaintiffs-Appellees

v.

CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, *et al.*,

Defendants

Camden County Democratic Committee, Intervenor-Appellant

On appeal from an Order Granting Preliminary Injunction of the
United States District Court for the District of New Jersey,
Civ. A. No. 3:24-cv-1098-ZNQ-TJB
Hon. Zahid N. Quraishi, U.S.D.J.

## BRIEF OF APPELLEES

Flavio L. Komuves
Brett M. Pugach
WEISSMAN & MINTZ
220 Davidson Ave.
Somerset, NJ 08873
732.563.4565
fkomuves@weissmanmintz.com
bpugach@weissmanmintz.com

Yael Bromberg
BROMBERG LAW LLC
43 West 43rd Street, Suite 32
New York, NY 10036-7424
212-859-5083
ybromberg@bromberglawllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED FOR REVIEW .....................................................1

STATEMENT OF RELATED CASES .....................................................2

STATEMENT OF THE CASE ..................................................................2

STANDARD OF REVIEW .......................................................................13

SUMMARY OF THE ARGUMENT ........................................................13

ARGUMENT ..............................................................................................16

I.  THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFFS
    ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AND
    FOURTEENTH AMENDMENT CLAIMS.....................................................16

    A. The District Court did Not Abuse its Discretion in Assessing the
       Burdens based on the Evidence in the Record .......................................17

    B. The District Court did Not Abuse its Discretion in Assessing the State
       Interests based on the Evidence in the Record and Applying the
       Balancing Test..........................................................................................26

    C. The District Court did Not Abuse its Discretion in Declining to Apply
       and Give Deference to New Jersey State Court Cases...........................32

    D. New Arguments Raised by *Amici* Do Not Undermine The District
       Court's Grant of a Preliminary Injunction based on the Evidence in
       the Record...................................................................................................35

i

II.   THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFFS
      ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ELECTIONS
      CLAUSE CLAIM ............................................................................................ 38

III.  IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC
      INTEREST ...................................................................................................... 42

IV.   *AMICUS* MAY NOT INJECT NEW ISSUES ON APPEAL AND, IN ANY
      EVENT, THEIR CLAIMS AS TO THE LACK OF JUDICIALLY
      MANAGEABLE STANDARDS AND AS TO *PURCELL* HAVE NO
      MERIT ............................................................................................................. 43

      A.  This Case Does Not Present a Nonjusticiable Political Question ........... 44

      B.  The *amici's Purcell* claims have no merit .............................................. 46

V.    INTERVENOR, A NON-STATE ACTOR, HAS NO RIGHT TO APPEAL
      AN INJUNCTION DIRECTED ONLY TO THE COUNTY CLERKS .......... 48

CONCLUSION ............................................................................................................... 51

CERTIFICATE OF COMPLIANCE .............................................................................. 53

# TABLE OF AUTHORITIES

Page(s)

Cases

*Akins v. Sec'y of State*,
  904 A.2d 702 (N.H. 2006) ............................................................... 31
*Allen v. Wright*,
  468 U.S. 737 (1984) ......................................................................... 50
*Allstate Prop. & Cas. Ins. Co. v. Squires*,
  667 F.3d 388 (3d Cir. 2012) ....................................................... 32, 33
*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ......................................................................... 16
*Anderson v. Martin*,
  375 U.S. 399 (1964) ......................................................................... 40
*Arizona v. Mecinas*,
  143 S.Ct. 525 (2022) ........................................................................ 36
*Board of Election Comm'rs of Chicago v. Libertarian Party of Ill.*,
  591 F.2d 22 (7th Cir. 1979) ........................................................ 35, 36
*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................... 16, 29
*California Democratic Party v. Jones*,
  530 U.S. 567 (2000) ......................................................................... 20
*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ............................................................... 42
*Cook v. Gralike*,
  531 U.S. 510 (2001) ................................................... 29, 38, 39, 40
*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008) ................................................................... 16, 33
*Democratic-Republican Org. of N.J. v. Guadagno*,
  700 F.3d 130 (3d Cir. 2012) ............................................................. 35
*Democratic-Republican Org. of New Jersey v. Guadagno*,
  900 F. Supp. 2d 447 (D.N.J.) ..................................................... 36, 45
*Devine v. Rhode Island*,
  827 F. Supp. 852 (D.R.I. 1993) ........................................................ 25
Duke Power Co. v. Carolina Evntl. Study Group, Inc.,
  438 U.S. 59 (1978) ........................................................................... 49
*Eu v. S.F. Cty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989) ......................................................................... 33

Flast v. Cohen,
     392 U.S. 83 (1968) ................................................................. 49

*Gould v. Grubb,*
     536 P.2d 1337 (Cal. 1975) .................................................. 31, 35

*Graves v. McElderry,*
     946 F. Supp. 1569 (W.D. Okla. 1996) .................................... 31

*Hicks v. Miranda,*
     422 U.S. 332 (1975) .............................................................. 45

*Holtzman v. Power,*
     62 Misc.2d 1020 (N.Y. Sup. Ct. 1970) ............................... 31, 35

*Jacobson v. Florida Sec'y of State,*
     974 F.3d 1236 (11th Cir. 2020) .............................................. 35

*Kamdem-Ouaffo v. Task Mgmt. Inc.,*
     792 F. App'x 218 (3d Cir. 2019) ............................................ 42

*Kautenburger v. Jackson,*
     333 P.2d 293 (Ariz. 1958) ..................................................... 35

Kowalski v. Tesmer,
     543 U.S. 128 (2004) .............................................................. 49

*Libertarian Party of Virginia v. Alcorn,*
     826 F.3d 708 (4th Cir. 2016) ................................................. 35

Linda R. S. v. Richard D.,
     410 U.S. 614 (1973) .............................................................. 50

*Mandel v. Bradley,*
     432 U.S. 173 (1976) .............................................................. 45

*Mann v. Powell,*
     333 F. Supp. 1261 (N.D. Ill. Dec. 30, 1969), *aff'd* 398 U.S. 955 (1970) ...............
     .................................................................................... 25, 35, 45

*McLain v. Meier,*
     637 F.2d 1159 (8th Cir. 1980) ............................................... 30

*Mecinas v. Hobbs,*
     30 F.4th 890 (9th Cir.) ...................................................... 36, 44

*Merrill v. Milligan,*
     142 S. Ct. 879 (2022) ................................................. 46, 47, 48

*Nelson v. Warner,*
     12 F.4th 376 (4th Cir. 2021) .............................................. 35, 44

*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff,*
     669 F.3d 374 (3d Cir. 2012) .................................................. 43

*Norman v. Reed,*
     502 U.S. 279 (1992) .............................................................. 16

iv

*Ohio Council 8 Am. Fed'n of State v. Husted*,
  814 F.3d 329 (6th Cir. 2016)................................................... 29, 34
*Pavek v. Simon*,
  967 F.3d 905 (8th Cir. 2020) ............................................................ 44
*Powell v. Mann*,
  398 U.S. 955 (1970) ................................................................... 35, 45
*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ............................................................................. 12
*Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*,
  38 F.4th 331 (3d Cir. 2022) .............................................................. 13
*Quaremba v. Allan*,
  67 N.J. 1 (1975) ............................................................................... 33
*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) .............................................................. 13
*Reynolds v. Sims*,
  377 U.S. 533 (1964) ......................................................................... 26
*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) ..................................................................... 44
*Sangmeister v. Woodward*,
  565 F.2d 460 (7th Cir. 1977).................................................. 25, 30, 35
*Schundler v. Donovan*,
  377 N.J. Super. 339 (App. Div.) ........................................................ 33
Simon v. E. Ky. Welfare Rights Org.,
  426 U.S. 26 (1976) ........................................................................... 50
*Surrick v. Killion*,
  449 F.3d 520 (3d Cir. 2006)............................................................. 33
*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ......................................................................... 40
*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) ......................................................................... 26
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ................................................................... 29, 34
*Weisberg v. Powell*,
  417 F.2d 388 (7th Cir. 1969)....................................................... 25, 35
*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. June 1, 2020) ................................................ 46
*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ......................................................................... 26

Statutes

N.J.S.A. 19:23-17 ................................................................................ 27, 34
N.J.S.A. 19:49-2 ....................................................................................... 3
U.S. Constitution, Art. I, Sec. 4, Cl. 1 ................................................. 38

Rules

Fed. R. App. 32(g) ................................................................................ 53
Fed. R. App. P. 32(a)(5) ....................................................................... 53
Fed. R. App. P. 32(a)(6) ....................................................................... 53
Fed. R. App. P. 32(f) ............................................................................ 53

Other Authorities

Miller,
   13 N.YU. J. Legis. & Pub. Pol'y ....................................................... 25
The County Line: The Law and Politics of Ballot Positioning in New Jersey,
   72 Rutgers Univ. L. Rev. 629 (2020) ............................................... 48
Ralph Simpson Boots, The Direct Primary in New Jersey (1917) ........................ 50

## JURISDICTIONAL STATEMENT

Appellees agree with Appellant's jurisdictional statement.

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court abuse its discretion by entering a preliminary injunction requiring New Jersey's county clerks to prepare (and use) primary ballots, for the June 4, 2024 primary election, using the "office block" format and not the "county line" format? In particular, did the District Court abuse its discretion in finding that Plaintiffs have shown a reasonable probability of success on the merits of their First and Fourteenth Amendment and Elections Clause claims?

2. Does this Court have jurisdiction to decide whether the District Court abused its discretion by ordering the county clerks to prepare the primary ballots in a particular way if all nineteen county clerks have (a) already designed ballots that comply with the District Court's order, (b) already conducted ballot draws for candidate order for those ballots, and (c) withdrawn their appeals? In particular, does this Court have jurisdiction over an appeal by Intervenor (Camden County Democratic Committee) where the District Court's order is directed only to the county clerks and not to Intervenor?

3. If this Court were to vacate the preliminary injunction, would that violate the principles announced in *Purcell v. Gonzalez* by requiring a further

redesign of the ballots, by Clerks no longer engaged on appeal, after the ballots have already been revised to conform to the injunction?

## STATEMENT OF RELATED CASES

Appeals from the judgment entered below, brought by other appellants, were docketed in this Court as Nos. 24-1593, -1601, and -1602 and have since been dismissed.

The District Court case remains pending at Docket No. 3:24-cv-1098- ZNQ-TJB (D.N.J.).

Two cases raising similar and overlapping legal issues remain pending in District Court: *Conforti v. Hanlon*, No. 20-08267-ZNQ-TJB (D.N.J.), and *Mazo v. Durkin*, No. 20-08336-ZNQ-TJB (D.N.J.).

Other arguably related cases are pending in state court: *Burlington Co. Reg. Rep. Org. v. Schwartz*, BUR-L-684-24 (filed Apr. 5, 2024) and *Maia-Cusick v. Solami Covello*, No. MER-L-677-24 (filed Apr. 8, 2024).

## STATEMENT OF THE CASE

Plaintiffs-Appellees, including current Congressman Andy Kim, a U.S. Senate candidate in the 2024 primary election, along with Sarah Schoengood and Carolyn Rush, both Congressional candidates, filed their Verified Complaint ("Complaint") on February 26, 2024. (DE1).

The Complaint illustrated examples of New Jersey primary ballots that, far from being orderly, had non-county-line candidates strewn across the ballot in seemingly random locations, distant from other candidates (a concept known as "Ballot Siberia") and stacked in the same column as their opponents. (Complaint, ¶¶89, 92 & Exh. A). A particularly egregious example of this ballot manipulation, practiced at the behest of Intervenor itself, is found in ¶5 of the Complaint.

The Complaint also annexed materials, including four expert reports, showing that New Jersey's unique rules for designing ballots, followed in 19 of its 21 counties, gave unfair advantages to a ticket of candidates favored by party leadership.[1] Ballot position and ballot design are extremely important factors to electoral success, and Plaintiffs' experts (DE1, 1-2, 1-3, 1-4) showed that the county line ballot format rewarded and benefited candidates on the line by outsized margins. (Opinion, pp. 31, 32, 38). Another expert designed an experimental survey for the 2024 election, which demonstrated the results found in historical studies were consistent with what could be expected in 2024. (Pasek Expert Report (DE1-2)).

---

[1] The mechanics of how the bracketing and ballot placement system works in New Jersey is set forth in detail in the Verified Complaint (DE1). This is largely undisputed, except for Intervenor's erroneous claim that unbracketed, non-pivot point candidates, like Plaintiffs Rush and Schoengood, can obtain first-ballot position (DE5, p. 26). Such candidates can only be listed on the ballot in a column after all pivot-point candidates are listed. In a race with three pivot-point candidates, the best such candidates can hope for is fourth position. N.J.S.A. 19:49-2; 19:23-26.1.

Dr. Rubin's report canvassed 45 senatorial and congressional elections, over 20 years, and found the candidate featured on the county line received an additional vote share of 13 to 83 percentage points over their opponents not on the county line, with an average margin of difference of 38 percentage points. Dr. Wang found that given the number of elections studied and the size of the differential, the likelihood that this occurred by chance was less than 1 in 1 quintillion. (Complaint, ¶¶105-06).

Dr. Rubin also studied 20 years of past NJ primary elections for *legislative* races from 2003-2023, specifically focusing on the power of the county line for incumbents. She found that "only 3 of the 209 (1.4%) incumbent legislators in competitive primaries who ran on the county line in all the counties in their districts lost their primaries." (*Id.*, ¶107). In contrast, over the same 20 years, "19 incumbent state legislators lost the county line in at least one county in their district" and "[t]en of those 19 (52.6%) lost their primaries." (*Id.*) This variance in on and off the line candidates' success was so substantial that Dr. Wang found the probability that "they came from a population with the same odds of re-nomination is less than 1 in 3 billion." (*Id.*, ¶108).

Dr. Rubin further studied ten years of primary elections for Governor, U.S. Senator, and U.S. Representative from 2012-2022, comparing the vote share of candidates "endorsed by county party organizations both in counties that used a

county line ballot and in counties that did not." (Complaint, ¶109). She found that county party endorsement alone, as distinguished from a favored ballot position, had different impacts from the favored ballot position itself. In 35 of the 37 contests identified, "candidates received a larger share of the vote when they were on the county line than when they were endorsed but there was no county line." *Id.* Dr. Rubin found "[t]he difference in the candidate's performance ranged from -7 to 45 percentage points, with a mean of 12 percentage points." (*Id.*) Dr. Wang determined the possibility this occurred by chance was 1 in 1.9 million, which "is consistent with the hypothesis that candidates derive a specific benefit from being on the county line that is separate from party endorsement." (*Id.*, ¶110).

Dr. Pasek's report considered the impact of display features of the county line ballot (specifically, the primacy, county line, "Ballot Siberia" and stacking of opposing candidates) that influence voter behavior and decisions, to the benefit of county party endorsees. They can "tend to nudge voters toward particular choices," and can "tend to confuse voters and result in voter errors." (Complaint, ¶112). Generally, candidates listed earlier on a ballot, and especially those listed in the first position, can be expected to perform better than candidates listed later on the ballot. (*Id.*, ¶113). "[Name] order effects have been shown to be larger in primary elections than in general elections." (*Id.*) Since only candidates running for or bracketed with a candidate running for the pivot point office can obtain first ballot

position, and because others (like Plaintiffs Rush and Schoengood) cannot, such candidates are thereby incentivized to bracket together with a candidate running for the pivot-point position regardless of ideological alignment. For these and other reasons stated in his report, such candidates are also incentivized to seek additional candidates to bracket with.

Dr. Pasek also explained other cognitive biases which can nudge voters, which can be particularly impactful on party-column ballots and which "have been shown to nudge voters toward selecting candidates in a single column." (*Id.*, ¶116). He explained that on party-column ballots, voters have a "tendency to simply proceed down the column . . . . even when they do have a meaningful preference between the candidates," and favored county-line candidates "irrespective of what voters' truly informed preferences might be." (*Id.*). Dr. Pasek found the case for using party column ballots in New Jersey primary elections is "far less compelling than in [a] general election," since primary candidates do not occupy stable coalitions and because factional slogans are less likely to provide cues of meaningful difference to voters in primary elections as compared to party labels in a general election. (*Id.*, ¶96).

Dr. Pasek also designed an experimental study to estimate and determine the impact of the ballot placement features of New Jersey's primary election ballot scheme. (*Id.*, ¶117). His analysis showed that, despite randomization of which

candidates were featured on the county line, the frequency with which voters chose U.S. Senate candidates on the county line "reflected a 10.0[%] benefit in vote share over chance and a 13.3[% benefit] over how those same candidates performed when they were not on the line," which was "strongly statistically significant." The benefits observed in the congressional races were even larger, "yielding a 26.2[%] benefit over chance and a 39.2[%] benefit over those same candidates when they were not on the line" in one congressional district, and yielding "an 11.4[%] benefit over chance and a 17.1[%] benefit over those same candidates when they were not on the line" in another district. He also found that "[a]cross these three contests, the presence of a party line benefit was consistently present" and "this benefit appears to have aided every candidate in every contest," improving "their vote shares by between 6.7[%] and 38.2[%] depending on the candidate and contest." (*Id.* at ¶119). Overall, he found strong evidence of "consistent influence of the [county] line," that benefited candidates on it. (*Id.*, ¶120).

Cumulative to this evidence, Congressman Kim explained his experience as a candidate that the "main consideration of viability in the eyes of many, if not all, people in the political space" was his ability to obtain the county line. (Tr. 168-72). The certification and brief submitted by the candidate *amici* further corroborated this observation (DE90-4 to 8, 118), as did the myriad of press accounts

substantiating that an opponent's acquisition of the county line was a barrier that could hardly ever be overcome for candidates lacking that advantage (DE1-6).

On the eve of the evidentiary hearing, the Attorney General wrote the Court, explaining that he would not defend the statutes because of (1) their unconstitutionality; (2) evidence presented in this case and in a prior litigation over the same issues, *Conforti v. Hanlon*, No. 20-08267 (ZNQ-TJB), "in the multiple years since these state statutes were challenged," did not yield "reliable empirical evidence countering" the record evidence; and (3) his legal conclusion that the ballot and bracketing system was not necessary "to advance governmental interests."[2] (DE149).

At the nine-hour evidentiary hearing, both sides presented witnesses, who were subjected to cross-examination, and ample opportunity was provided to the parties to determine the sequence of witnesses. (Opinion, pp. 21-23).

In the midst of the hearing, seven *in limine* motions were filed (DE152-158). Plaintiffs opposed these motions with supplemental certifications and a brief. (DE168-171, 177). The District Court rejected all seven motions *in limine*, holding that there were no timing or procedural deficiencies in Plaintiffs' initial, reply, and

---

[2]      While the District Court chose not to rely on the Attorney General's letter, it is part of the record in this case, and this Court can take judicial notice of his nonparticipation in this case and that he took the same position in *Conforti*, where he was a party and subsequently moved to withdraw from defending the constitutionality of this system. (DE172).

rebuttal reports, and that each of them, at least for purposes of the preliminary injunction, had sufficient reliability under Rule 702 and *Daubert*. (Opinion, p. 19).

In a thorough opinion issued March 29, 2024, the District Court held that the county line ballot, implemented by 19 of New Jersey's 21 county clerks, is discriminatory and unconstitutional because of large, and potentially outcome-determinative, effects in primary races and the corresponding burden that the "substantial benefit" places on the free exercise of candidates' right to (and right not to) associate. The Court determined that for purposes of the *Anderson-Burdick* analysis, this placed "severe" burdens on candidates and voters, violating their First and Fourteenth Amendment rights. (Opinion, p. 32).

The Court also observed that under *Anderson-Burdick*, government actors (such as the Clerk defendants) are obligated to prove the existence of sufficiently weighty state interests that outweighed the burdens identified by Plaintiffs. Here, the Court pointed out that the asserted state interest in facilitating candidates' and political parties' right to associate and communicate association to voters was amply satisfied by on-ballot slogans allowed by state law, and the otherwise unfettered right to campaign and advocate to voters in the way that the candidates and parties saw fit. (Opinion, p. 33).

Turning to voter confusion allegations, the Court acknowledged an example in connection with the Mercer 2020 primary ballot when one-third of all county

voters were disenfranchised due to the county-line ballot design. (*Id*.) Other evidence clearly showed that the possibility of voter confusion with office-block ballots was nonexistent; if anything, office-block ballots made it simpler for voters and easier to administer for county clerks. (*Id*. at 42, referring to reports and testimony by voting systems experts.) (E.g., DE95-1, Exh. A). Rep. Kim testified that a county-line ballot that listed candidates who were working against one another would be "very confusing to voters" (Tr. 182-83). The Court recounted Mr. Macias' expert testimony that "the office-block style was actually less complicated and therefore less time consuming." (Opinion, p. 24). There was no evidence at all, other than self-serving hearsay, that voters would be confused by office-block ballots: nothing on point from the defense witnesses, no voter witnesses, survey, scholarly papers, or other evidence, were offered.

The judge performed the requisite balancing of the proven harms against the asserted but unproven state interests that were still being asserted by the government parties (though without the support of the Attorney General), and found an injunction warranted on the First and Fourteenth Amendment claims.

The District Court also agreed with Plaintiffs that the county line ballot system "is improperly influencing primary election outcomes" and exceeds the State's right to regulate elections pursuant to the Elections Clause. (Opinion, pp. 34-35).

Following the hearing, one of the three opponents of Congressman Kim, First Lady Tammy Murphy, withdrew from the Senate race and asked Rep. Kim to accept the county lines in the counties Murphy had previously won. The Court requested briefing on this development. In general, Defendants suggested that the withdrawal of Ms. Murphy negated Rep. Kim's claims of electoral disadvantage that had been pleaded and testified to. However, Rep. Kim's other two opponents (Hamm and Campos Medina) did not withdraw, which continued to place him at some risk of electoral disadvantages traceable to the county line system. More to the point, the opponents of plaintiffs – Rush and Schoengood – stayed in their respective races.[3] Finally, Plaintiffs responded that Rep. Kim still faced associational harms (discrete from his electoral-disadvantage claims) that were exacerbated, not helped (DE183, 193), by the First Lady's withdrawal. The Court agreed. (Opinion, p. 37 ("The Court reiterates that Kim's harms are not alleviated because his main opponent withdrew from the election. Kim's harms, like Schoengood and Rush's, are real and immediate whether or not they are on the county line or not")).

---

[3] Whatever might be said of a Senatorial candidate's ability to compete on an equal and nondiscriminatory basis for the first ballot position, Congressional candidates like Schoengood and Rush who choose not to bracket or are denied bracketing *never* have that right.

The next day, at the request of a new proposed intervenor, but before the parties could be heard on the matter, the Court held that the injunction only applied to Democratic Party primaries and not to Republican ones. (DE207.) Finally, on April 1, the District Court denied several motions for a stay pending appeal (DE198, 204, 205, 217), concluding that the narrow grounds advanced for a stay – feasibility, failure to join indispensable parties, and the applicability to the Republican primaries – had already been canvassed and did not justify court action. (DE219.)

This appeal followed. On April 3, 2024, this Court, after setting an accelerated briefing schedule on the Appellants' motion for a stay pending appeal, and for plenary briefing, denied the renewed stay motion.[4]

---

[4]    In its initial order and in its opinion denying the stay, the District Court also rejected Defendants' claims that an injunction forbidding the use of the county-line ballot and affirmatively requiring the use of an office-block ballot would be infeasible or violate *Purcell v. Gonzalez*, 549 U.S. 1 (2006) ("*Purcell*"). The District Court had received several certifications, reports, and testimony on this point.

Subsequent developments confirmed that modifying the primary ballots was easily accomplished, and the Clerks' concerns were overblown at best. To that end, all the Clerk Defendants dropped their appeals, designed ballots in compliance with the Order, and conducted a ballot draw. As Defendant Colabella stated, once his voting system vendor, ES&S, "confirmed that it [designing a ballot in office-block format] would be possible, the reason for our appeal changed." Biryukov, *County clerks drop appeal of order barring use of county-line ballots*, (N.J. Monitor, Apr. 4, 2024), *available at* https://newjerseymonitor.com/2024/04/04/county-clerks-drop-appeal-of-order-barring-use-of-county-line-ballots/; *see also*

## STANDARD OF REVIEW

The standard for overturning a preliminary injunction places a heavy burden on appellants. In reviewing a decision granting a preliminary injunction, this Court "review[s] findings of fact for clear error, legal conclusions de novo, and the Court's decision to grant the preliminary injunction for abuse of discretion." *Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022) (citation omitted).

Here, the district judge had the benefit of all the legal and factual arguments, with testimony from the evidentiary hearing. Being on the "frontline" of this litigation gave him a special familiarity with the unique facts of this case and allowed him to tailor the injunction appropriately, with the benefit of all available information. It is thus uniquely appropriate here to apply a deferential, "abuse of discretion" standard in reviewing the grant of preliminary relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017).

## SUMMARY OF THE ARGUMENT

New Jersey's primary ballot design is a national outlier. All other states organize their primary ballots around the office sought, with almost all using an "office-block" display, *i.e.*, with candidates for a given office listed in a single

https://twitter.com/MercerClerk/status/1776629176625156496 (Defendant Covello poses with the office-block ballot that she and her voting systems vendor, Dominion, successfully designed on April 6, 2024).

column under (or to the side of) the office for which they were nominated. In contrast, New Jersey designs primary ballots in a gridded format that visually links candidates running for one office with those pursuing a different one. A core feature of this ballot is the "county line," a grouping of candidates endorsed by political party leadership who are rewarded with favored ballot position and visual cues nudging voters to support them.

Candidates chosen for the county line receive immense electoral advantages over their opponents, who are further disadvantaged by being placed in obscure portions of the ballot known as "ballot Siberia," being excluded from drawing for first ballot position, and being stacked in a column with their opponents or other candidates with whom they do not wish to associate.

The bracketing and ballot placement system fails to treat similarly situated candidates running for the same office equally. The substantial advantages and disadvantages, based on bracketing with candidates for other offices, present candidates with a Hobson's choice, pitting constitutional rights against one another: candidates are either (1) forced to associate in order to prevent their opponents from obtaining an advantage over them, thereby forfeiting their right to not associate; or (2) punished for exercising their right to not associate by being placed on the ballot off the county line and away from their bracketed opponents. This system violates a confluence of constitutional rights (right to vote, equal

protection, freedom of association) under the First and Fourteenth Amendments and violates the Elections Clause of the United States Constitution.

Scientific evidence substantiated this, in the form of expert reports and studies, sworn declarations by the parties, and live testimony, by both fact witnesses and expert witnesses, during a nine-hour evidentiary hearing. The Court credited the testimony and credibility of these witnesses, and found a severe burden on candidates' and voters' rights, which outweighed the ephemeral interests asserted by the government parties, who have now abandoned this appeal, effectively siding via an independent analysis with the Attorney General, who independently concluded that the balancing of burdens and interests favors Plaintiffs.

Political parties' associational rights are in no way abridged by the Court's injunction. New Jersey separately allows candidates to communicate the endorsements of political party leadership on the ballot through slogans featured alongside each candidate, which are not challenged here. And of course they may freely endorse, advocate, or spend on candidates of their choosing.

If the injunction is reversed, the clerks risk being forced to change course after successfully complying with the injunction. And New Jersey voters could be forced to vote on a primary ballot that the District Court has found to be unconstitutional. Because Intervenor, a private actor, has not come close to

meeting its burden for reversal of the preliminary injunction – an injunction that all of the state actors have already agreed to comply with – this Court should affirm the District Court's order.

## ARGUMENT

### I. The District Court correctly found that Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment Claims.

The District Court correctly held that the burdens of the bracketing and ballot placement system outweigh any alleged state interests. Under *Anderson-Burdick*, applicable to right to vote, equal protection, and associational rights claims under the First and Fourteenth Amendments, the court weighs the character and magnitude of the burden on Plaintiffs' constitutional rights against the precise interests of the State, taking into consideration "the extent to which it is necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). When the law subjects plaintiffs to severe restrictions, it is subject to strict scrutiny, and the state must show the law is narrowly tailored to support a compelling government interest; if the state law imposes minimal burdens that are reasonable and nondiscriminatory, the state's regulatory interests will generally suffice. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where burdens are not severe, courts adopt a sliding scale approach, and even slight burdens have to be justified by state interests "'sufficiently weighty to justify the limitation.'"

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (lead opinion) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

A. **The District Court did Not Abuse its Discretion in Assessing the Burdens based on the Evidence in the Record.**

Plaintiffs supported their request for a preliminary injunction with substantial evidence demonstrating the burden under the bracketing and ballot placement system. Under this system, party-endorsed candidates featured on the county line obtain substantial advantages over their opponents running for the same office due to the "weight of the line." In practice, such candidates inevitably appear in a full/almost-full column of candidates running for every office, with highly recognizable names at the top of the ticket, and in one of the first columns. Such candidates are included in the preferential ballot draw, and thus placed in columns to the left of (or rows above) their unbracketed opponents; unbracketed opponents will not have the benefits of the "weight of the line."

Plaintiffs' experts demonstrated that the advantages for candidates featured on the county line are substantial and provide an "enormous handicap." (Complaint, ¶127). Dr. Rubin's review of congressional and senatorial primaries in New Jersey from the past 20 years found consistently large differences between candidates on the county line and those who weren't.[5] Similarly, Dr. Pasek's study

---

[5] Drs. Rubin and Wang also found that, on average, the county line effect observed was over double-digit percentage points higher than that of an

17

focused specifically on the upcoming 2024 Democratic primary election and found that congressional candidates, on average, more than doubled their vote share when on the county line compared to when one of their opponents was on the county line, improving their performance, on average, by 24.7%. (*Id.,* ¶176). Dr. Pasek also found the benefit from being on the county line to be "consistently present," benefiting every congressional candidate in all races included in the study. (*Id.*, ¶119). The impact of the county line consistently altered election results, impacted a candidates' viability, and in some instances were outcome determinative. (DE1-2, ¶¶127-28, 180 n.45). The weight of the line strongly nudges voters to vote for candidates on the county line, and Plaintiffs' experts found "every reason to expect the benefit conferred by New Jersey's primary ballot design will be present in the upcoming June 4 primary election." (*Id.*, ¶183).

As explained by Dr. Pasek, based on a review of his literature and tested in his study, candidates listed first received additional benefits solely because they were listed first, due to the primacy effect. (*Id.*, ¶¶38-43). Nineteen county clerks conduct ballot draws that do not include every candidate running for the same office in the same draw, where each would have an equal chance to obtain the first ballot position. Instead, they draw for ballot position based on a pivot point office in an initial or preferential ballot draw. Once candidates for that particular office

---

endorsement/slogan alone on an office block ballot. *See* DE1-3, p. 4; DE1-4, pp. 13-14.

are drawn, all candidates running for other offices who are bracketed with candidates for the pivot point office are automatically placed on the ballot in the appropriate column. Thus, candidates bracketed with a candidate running for a pivot point office, and only those candidates, are eligible to be included in a drawing where they have a chance to receive first ballot position and its resulting benefits. By contrast, those running for a different office and not bracketed with a candidate for the pivot point office chosen by the county clerk suffers the precise opposite, which means a state-sponsored disadvantage for electoral success.

Dr. Pasek explained how primacy benefits are especially acute in primary elections. (*Id.,* ¶73). His study, focused specifically on the 2024 Democratic primary election, found that the Senate and House candidates studied saw, on average, an 18.9% improvement when listed first compared to later-listed positions on a party column ballot. (Complaint, ¶122). Dr. Pasek's study revealed that the effects from primacy and from weight of the line stack, creating even greater effects when the county line is in first ballot position. (*Id.*, ¶124).

Moreover, those who are not bracketed are subject to even further ballot and electoral disadvantages. They are excluded from even a chance at obtaining the first ballot position and will be placed further to the right (or bottom) of the ballot. Nor are they even automatically placed in the next available column after their bracketed opponents. Instead, county clerks routinely separate unbracketed

candidates from their bracketed opponents running for the same office with one or more blank spaces on the ballot, and relegate candidates to obscure places in "Ballot Siberia," where they are harder to find, harder to know what they are running for or who they are running against, and otherwise appear less legitimate. They will further be featured either in a column by themselves or stacked in a column with their opponents for the same office or with candidates running for other offices with whom they do not want to associate. For congressional candidates, Dr. Pasek's study found that when candidates were bracketed (and even excluding those with additional advantages of being on the county line) they received an average bump of 12.7% over when those same candidates were displayed as unbracketed. (*Id.* at ¶161).

The bracketing and ballot placement system also burdens fundamental associational rights. The Supreme Court recognized that a critical component of the freedom to associate is the corresponding right to not associate. *See, e.g.*, *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). Here, candidates' rights to not associate are burdened by forcing candidates to associate through bracketing and/or by punishing candidates who exercise their right to not associate with candidates running for other offices. Every candidate is faced with this Hobson's choice, where they can bracket to prevent their opponent from getting an advantage over them, or not bracket, and thereby subject themselves to a barrage of

ballot disadvantages and unequal treatment. Thus, the bracketing and ballot placement system unconstitutionally pits associational rights against equal protection rights, with the threat of substantial harm to electoral prospects hanging over candidates' heads.

Whether a candidate chooses to force themselves to associate to prevent their opponent from obtaining an advantage or whether they choose to be saddled with an electoral disadvantage by exercising their right to not associate, is really just two sides of the same unconstitutional coin. The greater the advantage one receives from the county line or from bracketing, the greater the interference with (or cost of) the free exercise of the right to not associate. Thus, Plaintiffs' evidence of the substantial ballot and electoral advantages speaks to all of the intertwined First and Fourteenth Amendment claims.

Congressman Kim testified that in the absence of injunctive relief, he would be forced to associate with candidates for other offices, including those with whom he would bracket on the county line, in order to prevent any of his opponents from obtaining an advantage over him. (*See* Tr. 182-185). Such candidates will include (1) those who had not supported or actively campaigned against him; (2) candidates whose policy backgrounds he does not agree with; and (3) numerous candidates that he does not even know. *See id.* He expressed concern that voters might mistake their policies as consistent with his, or assume he was supportive of

all candidates on the county line, or assume they were running mates. *Id.* Congressman Kim asserted he wants to run in a fair election that is not tied to candidates running for other offices, and further acknowledged that if he did not compete for and accept the county line, one of his opponents could be awarded the county line and obtain a substantial benefit over him. *Id.*

In the absence of injunctive relief, Plaintiffs-Appellees Schoengood and Rush will not be featured on the county line and will be unbracketed, as they did not want to bracket with candidates running for other offices with whom they did not agree on policy, did not want to tie their campaign's fate to the ups and downs of another candidate running for a different office, or sought but were declined bracketing rights.[6] (Complaint, ¶¶154-57, 163; DE188, pp. 1-2). This decision to not associate with other candidates means that one of their opponents will have the benefit of the county line, they would not be eligible for first ballot position (primacy effect), and will be subject to the various other harms faced by unbracketed candidates (e.g., ballot separation from opponents, Ballot Siberia,

---

[6]     That candidates are *allowed* to bracket with other candidates is besides the point. To mitigate against the weight of the line and other ballot disadvantages, imagine candidates running for office (whether it is House of Representatives or Town Council), having to find and recruit candidates for various other offices, including President of the United States, United States Senator, House of Representatives, county offices, and local candidates in each municipality in their district. (Tr. 245-46). Moreover, even if it were feasible to find and convince so many candidates to run, the candidate may not agree with their platforms (which might vary in substance and in kind) from the campaigns of these other candidates running for different offices.

column by themselves, stacked in column with opponents or candidates for other offices that they did not request to bracket with, etc.). Thus, they will be penalized on the ballot for exercising their right to not associate, and will therefore suffer electoral harm.

In the face of expert reports, testimony, twenty years of historical data, a survey tied to the upcoming primary election cycle, and other evidence, Intervenor and other Defendants submitted virtually no rebuttal evidence. They did not provide an expert to rebut Plaintiffs' evidence, nor provide their own. They did not submit statistical or other evidence or have any witness testify as to the burdens of any of Plaintiffs' claims. Instead, they chose to merely cross-examine Congressman Kim and his witnesses. (Opinion, pp.16-20).

The District Court credited Plaintiffs' fact testimony and Plaintiffs' experts. The District Court valued the three Plaintiffs' assertions as to why they did not want to associate with candidates running for other offices, and how they suffered harm whether they forfeited an advantage to their opponent by not bracketing or were punished if they asserted their right to not associate. (Opinion, p. 30). As to the significant advantage obtained from the primacy effect, the weight of the line, and bracketing, the District Court credited Plaintiffs' experts (Pasek, Rubin, and Wang), finding their reports, testimony, and other submissions to be "well-reasoned," to establish, "at this preliminary stage of this case," that (1) "candidates

placed in an early position on a ballot receive a distinct advantage"; and (2) "the county-line provides a substantial benefit in terms of voting over and above candidates that are merely endorsed by a county." (*Id.* at 30-32). Based on this large body of evidence, the District Court concluded that the bracketing and ballot placement system imposed a severe burden on Plaintiffs' First and Fourteenth Amendment rights. (*Id.* at 32-33).

Intervenor does not and cannot identify any reason why the District Court's factual determination was clear error. Indeed, further reasons support the determination of a severe burden in consideration of the combination of various ways in which the bracketing and ballot placement system violates First and Fourteenth Amendment rights. As to the magnitude of the burden of the various state-conferred ballot advantages, these effects consistently alter vote totals, can render otherwise unviable candidate viable, and can affect election outcomes. (*See* DE1-2, ¶¶127-28, 180 n.45). The extreme advantages based on ballot design are so large that Dr. Pasek concluded that candidates and the public could reasonably question whether a candidate winning by double-digit margins would have won if a different ballot design was used. (*Id.* at ¶183).

Additionally, among other burdens faced by unbracketed candidates, they are often placed in columns with other candidates with whom they do not want to associate, a practice which has been struck down by other federal courts for

burdening associational rights, for giving the appearance and impression of nonexistent candidates affiliations and/or creating voter confusion regarding same. *See, e.g.*, *Devine v. Rhode Island*, 827 F. Supp. 852, 861-62 (D.R.I. 1993) (placement of independent and/or minor party candidates for state office on a general election ballot underneath a political party or presidential candidate with whom they do not want to associate or belong "raises . . . serious constitutional concerns").

Furthermore, ballot order systems where the ballot position of candidates (let alone the other discriminatory design features in New Jersey primary elections) revolve around discretion of election officials have been found to be most objectionable and have been struck down by reviewing courts. *See* Miller, 13 N.YU. J. Legis. & Pub. Pol'y at 391; *Sangmeister v. Woodward*, 565 F.2d 460, 467 (7th Cir. 1977) (striking down ballot order practice that gave discretion to clerks for ballot placement); *Weisberg v. Powell*, 417 F.2d 388, 391-94 (7th Cir. 1969) (discretion exercised by election official to break ties in ballot order system was unconstitutional and in practice tipped scales in favor of some candidates, who were endorsed by party organizations, over others); *Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. Dec. 30, 1969) (opinion and final order), *summarily aff'd*, 398 U.S. 955 (1970). Here, the exercise of discretion has yielded varying and inconsistent standards in designing the ballot and selecting the pivot point, etc.

Worse, Dr. Pasek found that the frequency by which county line candidates secured the first column was a statistical anomaly and "suggests that at least some county clerks are willing to manipulate the rules to place the county line first and that they do indeed see first position as beneficial." (DE1-2, ¶¶65-69).

Long ago, the Supreme Court recognized the fundamental nature of voting rights because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (because voting rights are "preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."). In light of these circumstances, the evidence presented to the court, and the District Court's findings, applying strict scrutiny was warranted.

**B. <u>The District Court did Not Abuse its Discretion in Assessing the State Interests based on the Evidence in the Record and Applying the Balancing Test.</u>**

Appellant-Intervenor CCDC and Defendant Clerks also put on no evidence to support their alleged state interests. They did not provide expert or other witnesses in this regard, and presented no data/evidence to establish that the bracketing and ballot placement system furthered any legitimate state interests, let alone that they were sufficiently weight to justify the burdens. Instead, they loosely asserted general interests that are not furthered by this system: (1) preserving the

ability of candidates and political parties to associate; (2) communicating candidate associations to voters; (3) providing a manageable and understandable ballot; and (4) preventing voter confusion.

It is difficult to see how these interests are advanced by a county line ballot when two counties in the state already use an office block ballot, and when certain counties have previously used them. No other state in the country organizes their primary election ballots this way, and CCDC/Defendants utterly failed to identify why these interests are so strong in this state that they justify the severe burden on Plaintiffs' rights.

CCDC/Defendants claimed that the county line system was necessary to preserve parties' and candidates' associational rights and communicate those associations to voters. However, this case does not challenge the ability to endorse or even provisions of NJ law allowing candidates to be featured on the ballot with a common slogan. N.J.S.A. 19:23-17. Candidates who share common beliefs and want to be associated with one another and express that on the ballot will continue to have that ability. This goes above and beyond what the vast majority of other states allow to accompany a candidates' name on the office block ballot.

In the related matter of *Conforti v. Hanlon*, Docket No. 20–8267-ZNQ-TJB, the plaintiffs raised concerns about unbracketed candidates being stacked in the same column as candidates with whom they did not want to bracket. The response

from some defendants/intervenors was to admit that voters could tell that such candidates were not associated because they had different slogans. *See, e.g.*, *Conforti* AG Brief in Support of Motion to Dismiss, ECF 53-1, p. 21. If a slogan is sufficient to determine who is or is not associated, there can simply be no state interest in obtaining substantial ballot and electoral advantages from visually aligning their names and placing their opponents in obscure portions of the ballot. The real interest at stake for the Intervenor is in obtaining an enormous advantage via the state-sponsored ballot.

The association of candidates though visually aligning their names also often sends confusing signals to voters that render the alleged associational value of bracketing meaningless. Some ballot examples include the following:

- Candidate listed in the same column as a candidate for a different office with whom they did not request to bracket. *See* Complaint, DE1, ¶89 (Lawrence Hamm and David Applefield).
- Candidate listed in the same column as her opponent on the county line. *Id.*, ¶¶89-91 (Christine Conforti and Stephanie Schmid).
- Candidate running for two different offices was not bracketed with herself, but instead with her opponent. *Id.*, ¶¶92, 100 (Christine Conforti in Column 1 for one office and Column 4 for another).
- Congressional candidate bracketed with one Senate candidate in one county, but then with that Senate candidate's opponent in a different county. *Compare id.*, Exh. A, p. 49 (Singh and Smith bracketed in Ocean County), *with id.*, Exh. A, p. 43 (Mehta and Smith bracketed in Monmouth County).

What message is being communicated to voters? That some candidates listed in the same column are associated and some are not? That two candidates running against each other for the same office are somehow associated? That a candidate

wanted to associate with her opponent but did not with herself? That Smith shared common beliefs with Singh in Ocean, but lost those common beliefs and shared new ones with Singh's opponent, Mehta, in Monmouth?

Nothing in the injunction prevents candidates/parties from endorsing or otherwise supporting, funding, or associating outside of the ballot. *Cf. Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (law prohibiting judicial candidates from appearing on general election ballot with their party affiliation presents only a minimal burden "because political parties and judicial candidates remain free to provide, and voters remain free to receive, a plethora of information regarding" candidate affiliation). The ballot itself is not meant to be a forum for candidate expression. *See Burdick*, 504 U.S. at 408 (purpose of primary ballot was to select a candidate and ballot's constitutional function was not meant to provide "a more generalized expressive function"). There is no First Amendment right to use a ballot for expressive purposes. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 n.7 (2008); *cf. Cook v. Gralike*, 531 U.S. 510, 525 (2001) (state cannot use ballot to bring one piece of information to attention of voters and thereby highlight that information or issue as paramount).

The District Court recognized that any state interest in associational rights of parties/candidates were preserved through the slogan, and properly distinguished

that from any state interest in using the county line ballot design to infringe on other candidates' associational rights and inflict outsized effects on primary elections. (Opinion, p. 33).

The District Court also noted that the bracketing and ballot placement system "hampered" any state interest in a manageable and understandable ballot, and contributed to voter confusion.[7] *Id.* It is difficult to imagine a more confusing, less manageable ballot than NJ's primary election ballots. It is not designed to avoid confusion, but rather to provide arbitrary structural advantages to some candidates, selective disadvantages to others, and chaos at large. In *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980), the court struck down a ballot order law which favored incumbents, finding the state justification of "making the ballot as convenient and intelligible as possible for the great majority of voters . . . virtually admits that the state has chosen to serve the convenience of those voters who support incumbent and major party candidates at the expense of other voters," and holding such state interest does not even survive rational basis review. *See also Sangmeister*, 565 F.2d at 467 (rejecting interest in avoiding confusion and having

---

[7] A comparison of a NJ primary election ballot and those of other states makes this clear. *See* Complaint, ¶5. The office block ballots used in other states present similar to a multiple choice test that every pupil who attended grade school is inevitably familiar with. It lists the office and presents the choices of candidates running for that office. By contrast, NJ's unique primary ballots have candidates scattered haphazardly across different columns, separating candidates for the same office.

consistent practice for voters to know in advance because it was "difficult to understand how this practice satisfies those requirements any more efficiently than would a neutral system of ballot placement");[8] *cf. Graves v. McElderry*, 946 F. Supp. 1569, 1581 (W.D. Okla. 1996) (political patronage is not a legitimate state interest to classify or discriminate in configuring ballot position of candidates).

Drs. Pasek and Wang explained how the ballot uses visual cues that strongly nudge or otherwise steer voters toward the candidates on the county line. (*See, e.g.*, Wang Expert Report (DE1-4), p. 16; DE1-2, ¶¶125, 153-57, 169). Dr. Pasek explained how features unique to New Jersey in primary election ballots, identified above, induces voter confusion. (*Id.*, ¶106). He further explained that the bracketing and ballot placement system routinely violates 3 of 4 general balloting principles articulated by the Brennan Center: (1) not splitting contests; (2) ensuring consistent ballot design; and (3) ensuring visually that ballots are easy to understand. (*Id.*, ¶107). He identified examples from the 2020 primary elections of large and disproportionate numbers of (1) overvotes when two congressional candidates were placed in the same column; and (2) undervotes, when an incumbent U.S. Senate candidate bracketed with candidates off the county line.

_____

[8] *See also Matter of Holtzman v. Power*, 62 Misc.2d 1020, 1024 (N.Y. Sup. Ct. 1970), aff'd, 34 A.D.2d 917 (N.Y. App. Div. 1970) (rejecting avoidance of voter confusion as state interest); *Akins v. Sec'y of State*, 904 A.2d 702, 708 (N.H. 2006) (rejecting asserted interest in promoting easily understood ballot); *Gould v. Grubb*, 536 P.2d 1337, 1344-45 (Cal. 1975) (rejecting asserted state interest of facilitating "efficient, unconfused voting").

(*Id.*, ¶109). Nothing about the bracketing and ballot placement system promotes avoidance of confusion.

Under *Anderson-Burdick*, severe burdens warrant strict scrutiny, and there must be a compelling government interest that is narrowly tailored to justify the burdens. Based on the record, the District Court did not abuse its discretion and in finding that the State's interests were "not especially compelling." (Opinion, , p. 33). Even if strict scrutiny were not applied, the state interests must be sufficiently weighty to justify the burdens. The District Court properly found that Plaintiffs "support[ed] their application with a substantive factual record, including export reports and credible expert and factual testimony," and that, at this preliminary stage, the court did not have any reason to conclude that "these burdens can be justified by the State's interests." (*Id.*, p. 34).

### C. The District Court did Not Abuse its Discretion in Declining to Apply and Give Deference to New Jersey State Court Cases.

CCDC desperately tries to cling to stale/misguided state court opinions discussing the constitutionality of the bracketing and ballot placement laws. They claim the District Court should have looked/predicted how state courts would rule on the issue of constitutionality. This misguided assertion is wrong as a matter of law. The cases they rely on for this proposition, *e.g.*, *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388 (3d Cir. 2012), were diversity of citizenship jurisdiction cases, calling for an *Erie* guess on state law governing the *state claims* at issue. *See*

*id.* at 390. Here Plaintiffs brought *federal claims* under the U.S. Constitution, and there can be no doubt that state court interpretations of federal law are not binding on federal courts. *Surrick v. Killion,* 449 F.3d 520, 535 (3d Cir. 2006).

Furthermore, the two cases cited are devoid of persuasive value. In *Quaremba v. Allan*, 67 N.J. 1 (1975), a case decided prior to adoption of the *Anderson-Burdick* test, the court merely looked to whether the county clerk's actions were "rooted in reason," and did not engage in the careful consideration and weighing of the burdens and state interests that may/may not have been sufficiently weighty to justify the burdens imposed. *See Crawford*, 553 U.S. at 191.

In *Schundler v. Donovan*, 377 N.J. Super. 339 (App. Div.), *aff'd*, 183 N.J. 383 (2005), the appellate court misconstrued the Supreme Court's decision in *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989), which struck down California's primary endorsement ban based on associational rights of parties to endorse candidates and govern their internal affairs. *Eu* was decided in the context of the right to "endorse" candidates, and had nothing to do with bracketing or associational rights *on the ballot itself*. Nevertheless, the Appellate Division claimed that *Eu* required, "as a matter of constitutional imperative," that every candidate has an associational right "to declare a ballot affiliation with any other candidate." *Id.* at 348. This extreme expansion of the holding in *Eu* to require bracketing on the ballot is not supported in *Eu*, conflicts with various federal cases

recognizing the ballot itself is not meant to be a forum for candidate expression,[9] and is severely undermined by the fact that *no other states* organize their primary election ballots the way 19 New Jersey counties do.

Even with the preliminary injunction, candidates' and parties' associational rights in New Jersey go well above and beyond what other states allow, since they can still affiliate on the ballot via a common slogan. *See* N.J.S.A. 19:23-17. Moreover, unlike in *Quaremba* or *Schundler*, here the District Court had before it unrebutted expert reports and expert testimony, and the state's Attorney General's independent conclusion that the bracketing and ballot placement system was unconstitutional, taking the rare and extraordinary measure of refusing to defend its constitutionality. *See* DE149.

### D. New Arguments Raised by *Amici* Do Not Undermine The District Court's Grant of a Preliminary Injunction based on the Evidence in the Record.

While not raised by Intervenor or by any party below, Plaintiffs briefly respond to dispel *amici's* misplaced concern that affirming the preliminary injunction would somehow "create" a circuit split. This is wrong both because the

---

[9] *See, e.g.*, *Wash. State Grange*, 552 U.S. at 453 n.7 ("The First Amendment does not give political parties a right to have their nominees designated as such on the ballot."); *Husted*, 814 F.3d at 336 (upholding law preventing judicial candidates from appearing on general election ballot with party affiliations because "a political party has no First Amendment right to use the general-election ballot for expressive activities and "has no right to use the ballot itself to educate voters").

cases they rely on are highly distinguishable and because *Anderson-Burdick* is fact-specific, and regardless would not "create" a circuit split.

All of the cases *amici* rely on are presented in a different context, namely ballot order in general elections. *See Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708 (4th Cir. 2016); *Nelson v. Warner*, 12 F.4th 376 (4th Cir. 2021); *Board of Election Comm'rs of Chicago v. Libertarian Party of Ill.*, 591 F.2d 22 (7th Cir. 1979); *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020); *Democratic-Republican Org. of N.J. v. Guadagno*, 700 F.3d 130 (3d Cir. 2012). By contrast, this case arises in the context of a *primary* election[10], where, in New Jersey, all candidates on the ballot must necessarily be within the same political party. In fact, in the context of primaries, various courts have ruled in favor of plaintiffs in ballot order cases. *See, e.g.*, *Mann v. Powell*, 333 F. Supp. 1261 (N.D. Ill. 1969), *aff'd*, *Powell v. Mann*, 398 U.S. 955 (1970); *Sangmeister v. Woodard*, 565 F.2d 460 (7th Cir. 1977); *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969); *Gould*, 536 P.2d 1337 (ballot order system unconstitutional under state and federal constitution); *Matter of Holzman v. Power*, 62 Misc.2d 1020 (N.Y. Sup. Ct. 1970), *aff'd*, 311 N.Y.S.2d 824 (1970) (same); *Kautenburger v. Jackson*, 333 P.2d 293 (Ariz. 1958) (same). The summary affirmance of *Mann* is the only time the Supreme Court ruled in a ballot order case. *See supra*, pp. 45-46.

---

[10]     Plaintiffs' experts explained that primacy effects are larger in primary elections than in general elections. (*See* DE1-2, ¶73).

Even in a general election context, *amici's* contention that all recent Circuit Courts reject wholesale the idea that ballot order could amount to constitutional harm is simply wrong for two reasons. First, as recently as 2022, the Ninth Circuit rejected this, reversing a district court decision that dismissed the plaintiffs' claims. *Mecinas v. Hobbs*, 30 F.4th 890, 904-05 (9th Cir.), *cert. den., Arizona v. Mecinas*, 143 S.Ct. 525 (2022) (remanding because the burden from the primacy effect was a factual question and even if the burden was not severe, it could be serious enough to weigh the state interests and assess if alternative methods could advance them). Second, as noted by the court in *Mecinas*, and in the only Third Circuit case relied on by *amici*, the burdens imposed are a factual inquiry which depend on the evidence applied to *Anderson-Burdick*.[11] *See, e.g., Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447, 457-58 (D.N.J.), *aff'd*, 700 F.3d 130 (3d Cir. 2012) (rejecting plaintiffs' claims because they provided no admissible empirical evidence or affidavits demonstrating a benefit from ballot placement and noting such evidence was required by courts in ballot order cases in other circuits).

---

[11] The District Court also found in favor of Plaintiffs on the likelihood of success on their Elections Clause claim, which does not require *Anderson-Burdick* balancing, and which remain unaddressed by CCDC's/*amici*.

Furthermore, *amici* overlook that the burdens here go far beyond simply ballot order alone.[12] In fact, Dr. Pasek found from the results of his study that the primacy effect in party-column ballots was larger than that found in office block ballots. (DE1-2, ¶¶145-152). And, while primacy is undoubtedly one of the harms suffered under the county line system, Plaintiffs also submitted robust evidence credited by the District Court as to the burdens from the weight of line, restrictions on their rights to not associate, and the fact that unbracketed candidates get further disadvantages in ways that go beyond just not being listed first, including being placed in Ballot Siberia and stacked with candidates with whom they do not want to associate.

Moreover, none of the cases cited by *amici* involve situations where the state's Attorney General found the system unlawful and discriminatory, and

---

[12]     In the face of evidence of an enormous handicap in favor of party-endorsed candidates and substantial advantages due to ballot design, *amici* refer to the "windfall" vote and appear to ask why the county political parties should not be entitled to it. Perhaps the better question is why New Jersey has a unique primary election ballot design that influences voters so strongly in favor of certain candidates over others, especially when the party-endorsed candidates already have a slogan on the ballot itself which can identify which candidates the party is associating with. Furthermore, Plaintiffs' experts explained that the influence of the visual display of New Jersey's primary election ballots nudged voters to straightline their votes, even if they would not otherwise do so, and did not otherwise do so when presented with an office block ballot that identified the party-endorsed candidates via a slogan. DE1-2, ¶¶153-157; *id.* ¶116 (The weight of the line encourages voters to focus on the county line candidates and "simply proceed down the column . . . *even when they do have a meaningful preference between the candidates*.") (emphasis added).

refused to defend their constitutionality. (DE149). The District Court's grant of relief stands firm, and this Court should give little credence to unsubstantiated contentions of "creating" a circuit split.

## II. The District Court correctly found that Plaintiffs are likely to succeed on the merits of their Elections Clause Claim.

Tellingly, neither Intervenor nor *amici* address the Elections Clause claim, an independent grounds upon which the District Court correctly found that Plaintiffs were likely to succeed. The Elections Clause is the only delegation of power granted to States over congressional elections, and that power is expressly limited to regulating the time, place, and manner of such elections. U.S. Constitution, Art. I, Sec. 4, Cl. 1; *see Cook v. Gralike*, 531 U.S. 510, 522-23 (2001).

In *Cook*, the Supreme Court considered a Missouri Constitution provision requiring a notation be printed on both primary and general election ballots next to federal candidates who failed to take certain actions in support of their term limits, and/or refused to take a pledge on term limits in the event they get elected (hereinafter "Term Limit Amendment"). *See id.* at 513-15 (citations omitted). The notations provided: "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS," and/or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS." *See id.* at 514 (citations omitted). At issue was whether the Term Limit Amendment merely regulated the manner of holding elections by providing information related

to the congressional candidates, and therefore fell within the power delegated to the States by the Elections Clause. *See id.* at 523.

The Court reiterated that the Elections Clause allowed States to adopt procedural regulations but not "dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional constraints." *Id.* (cleaned up). It further found that the Term Limit Amendment was not a procedural regulation, as it clearly was not a time or place regulation, nor did it regulate the manner of holding elections. *Id.* The Court noted that the term "manner" included matters such as "'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" *See id.* at 523-24 (citation omitted). Thus, the Term Limit Amendment did not fall within the types of procedural regulations "which experience show are necessary in order to enforce the fundamental right involved, ensuring that elections are 'fair and honest,' and that 'some sort of order, rather than chaos, is to accompany the democratic process.'" *Id.* at 524 (citations omitted).

Instead, the Court found it was "plainly designed to favor candidates who are willing to support the particular form of a term limit amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal" because it "attaches a concrete consequence to

noncompliance." *Id.* The Court recognized that the labels operate to appear harmful or negative, and as a sanction or penalty for those failing to comply with those conditions, further acknowledging the "substantial political risk" imposed by the ballot labels on such candidates. *Id.* at 525.

The Court further found that "the adverse labels handicap candidates 'at the most crucial stage in the election process – the instant before the vote is cast.'" *Id.* (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). Furthermore, the Court found that it directed voters' attention to a single issue or consideration, implying that such issue/consideration was important and paramount, influencing voters to cast their vote against disfavored candidates. *See id.* Although unable to determine exactly how much a candidate was disadvantaged by the label, the Court nevertheless held that "the labels surely place their targets at a political disadvantage to unmarked candidates for congressional office," and thus were not a procedural regulation, but one that attempted to "'dictate electoral outcomes.'"[13] *See id.* at 525-26 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-34 (1995)).

---

[13] Thus, the phrase "dictating electoral outcomes" clearly does not require Plaintiffs to demonstrate literally that the ballot advantages would change the result of any given election. Nevertheless, going even further than what was presented in *Cook*, here Plaintiffs' expert evidence demonstrates that the size of the various effects observed are greater than the margin of victory in many recent elections. (*See* DE1-2, ¶¶127-28, 180 n.45).

As in *Cook*, New Jersey's bracketing and ballot placement laws do exactly what the Elections Clause prohibits: it influences election outcomes, *and* favors and disfavors classes of candidates.[14] The list of items that *Cook* (and other courts deciding Elections Clause cases) viewed as procedural all have something in common: they are meant to apply neutrally, and not to bestow an advantage to some candidates over others.

New Jersey's laws and the ballot design practices of 19 county clerks substantially favor candidates on the county line over all other candidates. As in *Cook*, the advantages and disadvantages flow from concrete benefits provided to bracketed candidates, and denied to unbracketed ones. In addition to providing an "enormous handicap" to party-endorsed candidates featured on the county line over their opponents, the bracketing and ballot placement system allows county clerks to further ostracize unbracketed candidates, separating them with ballot gaps, and relegating them to obscure portions of the ballot in Ballot Siberia.

Thus, the District Court properly concluded that Plaintiffs were likely to succeed on their Elections Clause claim, having found that the bracketing and

---

[14]     *See generally* Complaint, ¶¶103-27 (collecting evidence from expert reports of how the government imposes ballot and electoral advantages that amount to an "enormous handicap" in favor of party-endorsed candidates featured on the county line, and further systematically disadvantages unbracketed candidates compared to bracketed candidates, in ways that alter election results and even carry the potential to be outcome-determinative).

ballot placement system "improperly influenc[es] primary election outcomes by virtue of the layout on the primary ballots." Opinion, p. 35.

## III.    Irreparable Harm, Balance of Equities, and Public Interest

The District Court did not abuse its discretion in finding that Plaintiffs demonstrated imminent, irreparable harm, that the harm to Plaintiffs in the absence of relief outweighed the harm to Defendants if relief was granted, and that granting relief was in the public interest. This is so for all reasons set forth in the Opinion, pp. 35-48, and need not be repeated at length herein. All three Plaintiffs highlight that, absent injunctive relief, their injuries would inevitably occur in the upcoming primary election under the existing bracketing and ballot placement system, implicated fundamental constitutional rights, and could not be redressed by monetary damages. *See Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)). As set forth above, Intervenor fails to appreciate that there are multiple ways in which candidates can be irreparably harmed under the bracketing and ballot placement system, and that the harm to each Plaintiff (including to Schoengood and Rush, as unbracketed candidates, in addition to Kim's associational rights) cannot be ignored. Plaintiffs only get one shot at a fair election without an unconstitutional governmental thumb on the scale, and preliminary injunctive relief is required to prevent such irreparable harm.

As to the balance of the harms, the only evidence presented (other than from Plaintiffs) was from the Defendant County Clerks, as to the feasibility and timing of redesigning the ballots. Those arguments are now moot, both because all of the Defendant County Clerks subsequently withdrew their appeals, and because Defendants have been complying with the injunction. Furthermore, Intervenor has not presented any evidence of harm whatsoever, outside of speculative arguments of counsel in briefing. And, contrary to Intervenor's assertions, the ability to endorse and communicate such endorsements is not implicated by the injunctive relief, and they can do so *on the ballot itself* via slogans.

The evidence presented by Plaintiffs demonstrates that absent injunctive relief, the fairness of New Jersey's primary election results could well be doubted. *See* DE1-2, ¶ 183.

## IV.    *Amicus* may not inject new issues on appeal and, in any event, their claims as to lack of judicially manageable standards and as to *Purcell* have no merit.

*Amicus* briefs are not "a method for injecting new issues into an appeal"; accordingly, "an issue raised only by an *amicus curiae* is normally not considered on appeal." *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 n.2 (3d Cir. 2012) (quotations omitted). Nonetheless, those claims lack merit and are addressed briefly below.

### A. This Case Does Not Present a Nonjusticiable Political Question

No party below argued that Plaintiffs' claims present a non-justiciable political question; that claim appears for the first time on appeal, raised solely by an *amicus*. Even if properly raised, the claim that there are no judicially discernable and manageable standards to determine Plaintiffs' claims lacks merit.

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), is a landmark redistricting case that followed a half century of the Supreme Court's grappling with partisan gerrymandering claims generally, and two decades of legal contests concerning various reiterations of the North Carolina maps specifically. The Supreme Court held that partisan gerrymandering claims, unlike other redistricting challenges, are nonjusticiable for want of identifying a "clear, manageable, and politically neutral" standard. *Id.* at 2498 (quotation omitted).

*Rucho* is inapposite here, where a fair, neutral, judicially manageable standard is readily available: the application of the *Anderson-Burdick* test weighing burdens and state interests of laws impacting the First and Fourteenth Amendment rights of candidates and individuals in the voting rights context. *Rucho* should not be read expansively to limit applicability of the decades-old *Anderson-Burdick* balancing test, nor to end judicial review of ballot order and other ballot placement cases. *See Pavek v. Simon*, 967 F.3d 905, 907 (8th Cir. 2020) (acknowledging *Rucho* and nevertheless concluding, "We have adjudicated the merits of such [ballot order] claims before and have comfortably employed judicially manageable

standards in doing so.") (citation omitted); *Nelson v. Warner*, 12 F.4th 376, 385-87

(4th Cir. 2021) (same); *Mecinas v. Hobbs*, 30 F.4th 890, 901 (9th Cir. 2022)

(same). This familiar test has been applied by federal courts for decades, and

specifically in the context of ballot order cases, including from the Third Circuit.

*See, e.g.*, *Guadagno*, 900 F. Supp. 2d at 447.

Moreover, the Supreme Court has summarily affirmed the availability of a

judicially manageable standard in ballot order schemes. *See Powell v. Mann*, 398

U.S. 955 (1970), *aff'g* 333 F. Supp. 1261 (N.D. Ill. 1969) (three-judge district court

panel granting permanent injunctive relief invalidating as unconstitutional a

practice employed by the Illinois Secretary of State to determine ballot order.) In

*Mann*, the Illinois Secretary of State presented the question for review as: "Does

the 'political question doctrine' permit federal judicial cognizance of political

cases, involving inter- or intra-party election disputes?" No. 1359, Appellants'

Motion to Supreme Court, 1970 WL 155703, *6 (March 27, 1970).[15]

The Supreme Court's summary affirmance was clear: the political question

doctrine is inapplicable. The Court thereby rejected all jurisdictional claims;

otherwise, the Court simply could not have affirmed. Accordingly, in *Mann*, the

---

[15]    A summary affirmance precludes lower courts from reaching contrary
conclusions with respect to the precise issues presented as well as those
"necessarily decided by" the Court. *See Mandel v. Bradley*, 432 U.S. 173, 176
(1976); *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) ("[L]ower courts are bound by
summary decisions by this Court until such time as the Court informs [them] that
[they] are not.") (internal quotation marks and citation omitted).

Supreme Court "necessarily decided" on the "precise issue" of the inapplicability of the political question doctrine to a ballot order challenge, and such conclusion is binding.

**B. The *amici's Purcell* claims have no merit.**

As with the political question discussion, the issue is raised only by *amici* and is not cognizable. The lone Appellant, Intervenor CCDC, does not cite to *Purcell*, and the parties charged with implementing the Court's order have withdrawn their appeals and begun to implement the order.

The district court properly disposed of this argument, finding that "[t]he problem . . . is that this case is not last-minute. It was filed 100 days before the primary election on June 4th, and well over a month before the April 5th deadline for preparing official primary election ballots for printing. On this basis alone, this case is readily distinguishable from the line of cases invoked[.]" (DE194, p. 28.).[16] Moreover, while the District Court did not abuse its discretion in declining to invoke the *Purcell* doctrine to prevent a preliminary injunction, now that the county clerks have begun to implement the District Court's Order, any *Purcell* issues would caution against vacating the preliminary injunctive relief.

---

[16]     *See also Yang v. Kosinski*, 960 F.3d 119 (2d Cir. June 1, 2020) (affirming grant of preliminary injunctive relief 21 days before primary, affirming district court order to add office of President on primary election ballot and list qualified candidates).

Even in the case relied on by Republican *amici*, *Merrill v. Milligan*, 142 S. Ct. 879 (2022), Justice Kavanaugh recognized that application of the *Purcell* doctrine is context specific: "How close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects. Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement. " *Id*. at 881, n.1 (Kavanaugh, J., concurring).

Here, the state actors, who have withdrawn from this appeal, are well underway in designing office-block ballots for the Democratic primary. Despite their initial protests, the clerks have apparently received confirmation from their voting system vendors which comports with the expert proofs proffered by Plaintiffs – that they can in fact design office-block ballots with minimal disruption. They have accepted the District Court's preliminary injunction and are implementing it. Whether that design will apply to future Republican primaries is not presently before this Court, and the preliminary injunction need not be disrupted at this phase of the litigation.

## V.    Intervenor, a Non-State Actor, has No Right to Appeal an Injunction Directed Only to the County Clerks.

Plaintiffs' central argument is that the design of the New Jersey's primary ballots may not be manipulated, to the disadvantage of candidates and voters, at the

behest of private political interests. The procedural posture of this appeal confirms those concerns.

All nineteen of the County Clerks – the state Defendants to whom the injunction is directed – have withdrawn their appeal of the preliminary injunction and have proceeded to design new primary ballots that conform with the District Court's Order. Specifically, on April 4-5, the County Clerks Defendants drew for ballot order and prepared new primary ballots for printing, explicitly conceding that office-block ballot design is feasible. Biryukov, supra n.4 (Defendant Mercer County Clerk explained, "Once [the voting systems vendors] tested and confirmed that it would be possible, the reason for our appeal changed" and "[o]ur main concern is to administer an election – and until yesterday we had no confirmation that we could administer an election as ordered by the Court"); *Id.* (Defendant Hunterdon County Clerk explained, "Hunterdon has the ability to comply with the order and has withdrawn from the appeal.").

The only remaining appellant is Intervenor CCDC – a private political organization intent on preserving its political leverage through the continued use of unconstitutional ballots. Intervenor cannot stand in the shoes of state actors, to assert state and governmental interests (see Intervenor Br. at 29-33, 41, 43-45), in

defense of a statute that even the New Jersey Attorney General refuses to defend.[17] Intervenor was not a named defendant; rather, it chose to intervene, and it has no parens patriae right to assert the interests of the state.

The Supreme Court has emphasized a prudential limitation on standing when the rights of third parties are implicated – "the avoidance of the adjudication of rights which those not before the Court [here, the state actors] may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Evntl. Study Group, Inc*., 438 U.S. 59, 80 (1978) (citation omitted). A party like Intervenor must assert "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" like the Clerk Defendants. Id. (citation omitted); see also *Kowalski v. Tesmer*, 543 U.S. 128, 129 (2004).

Article III's limit on federal judicial power "recognizes that such suits often are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing

---

[17]  Then-New Jersey Governor Woodrow Wilson championed primary reform to "break up the private and secret management of party machines" and the need for "government representative of the people, [not] government representative of political managers who served their own interest and the interests of those with whom they found it profitable to establish partnership." Brett M. Pugach, The County Line: The Law and Politics of Ballot Positioning in New Jersey, 72 Rutgers Univ. L. Rev. 629, 633-34 (2020) (citing Ralph Simpson Boots, The Direct Primary in New Jersey 30-31, 66 (1917)).

conflicting and demanding interests." *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968) (citations omitted) (emphasis added). The lack of a clash of adversary arguments "exploring every aspect of a multifaceted situation" is evident here by the absence of every single state actor.

The likelihood that any injury asserted by Intervenor may be redressable by a favorable ruling is "too speculative." *Allen v. Wright*, 468 U.S. 737, 752 (1984). Intervenor has put forth no affirmative proofs in the record to establish its purported harms; the only certifications accompanying its filings to date are those of its counsel. (DE41, DE81, DE82.) Intervenor did not proffer a single witness, despite the District Court's instructions. (DE141; Tr 14:17-15:4.) The interests belatedly asserted by Intervenor necessarily require a governmental voice to challenge the Order and address its implication.

Even if this Court were to vacate the preliminary injunction (as Intervenor the seeks), there is no reason to believe the Defendant Clerks would suddenly reverse course after taking substantial steps toward complying with the Order. The redressability prong of standing is absent when relief depends on the voluntary actions of others. See, e.g., *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43 (1976) (held, too "speculative" to conclude that denying charitable-deduction tax status to hospitals would cause them to provide future treatment to indigent plaintiffs); *Linda R. S. v. Richard D.*, 410 U.S. 614, 614 (1973) (mother failed to

show that enforcement of child support statute would result in child support rather than jailing of the child's father); *Allen v. Wright*, 468 U.S. 737, 758 (1984) ("it is entirely speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies").

Intervenor cannot show a reasonable likelihood that the Clerk Defendants, who are not parties to this appeal, would alter their conduct even if this Court were to reverse the preliminary injunction. The relief requested on appeal is therefore not justiciable.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's preliminary injunction.

Respectfully submitted,

/s/Flavio L. Komuves                  /s/ Yael Bromberg
/s/Brett M. Pugach                    Yael Bromberg, Esq.
Flavio L. Komuves, Esq.          BROMBERG LAW LLC
Brett M. Pugach, Esq.             43 West 43rd Street, Suite 32
WEISSMAN & MINTZ          New York, NY 10036-7424
220 Davidson Ave.                 212-859-5083
Somerset, NJ 08873            ybromberg@bromberglawllc.com
732.563.4565
fkomuves@weissmanmintz.com
bpugach@weissmanmintz.com

*Counsel for Plaintiffs-Appellees*

**Dated:**      April 8, 2024

**CERTIFICATION OF BAR MEMBERSHIP**

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Yael Bromberg, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

/s/Yael Bromberg, Esq.
Bromberg Law LLC
43 West 43rd Street, Suite 32
New York, NY 10036-7424
(212) 859-5083
ybromberg@bromberglawllc.com

Dated:      April 8, 2024

# CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. 32(g) and Local Rule 31.1, I certify the following:

1. This brief complies with Rule 29 because it contains 12,319 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because a virus detection program, McAfee, has been run on the electronic version of the brief and no viruses were detected.

/s/Yael Bromberg, Esq.
Bromberg Law LLC
43 West 43rd Street, Suite 32
New York, NY 10036-7424
(212) 859-5083
ybromberg@bromberglawllc.com

**Dated:**     April 8, 2024