# EXHIBIT A

**In the Matter Of:**

In re: Daniel's Law Compliance Litigation

# MATTHEW WILLIAM ADKISSON

*July 30, 2024*

*30(b)(6), Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1         A.    Sorry.  Could you repeat the question.
 2         Q.    Sure.  The assignors in this case share
 3   in the recovery of any settlement or judgment
 4   related to an action to enforce the Daniel's Law
 5   rights; correct?
 6         A.    When you refer to this case, we have
 7   many different lawsuits, but in general our terms
 8   of service with a covered person in an instance
 9   like you are referring to, I think, would govern a
10   contractual relationship that we have with them
11   such that after the assignment was made, to the
12   extent we collected a damage award, we would remit
13   part of that award to the covered person.
14         Q.    Okay.  And that would be 65 percent of
15   any net recovery, correct, under your service
16   terms?
17         A.    I believe that's correct, yes.
18         Q.    Okay.  And in terms of funding, paying
19   counsel, because it's a net 65 percent, the
20   assignors are paying the legal fees; correct?
21         A.    I would not agree with that, no.
22         Q.    Okay.  Why don't you agree with that?
23         A.    You are asking me if the assignors are
24   paying the legal fees?
25         Q.    Correct.
```



```
 1        A.     That's not correct.
 2        Q.     Okay.  Who is paying the legal fees?
 3        A.     My understanding of the flow of legal
 4   fees is that some of the fees might be paid by
 5   Atlas, other legal fees would -- and I'm not a
 6   lawyer here, so I am speaking to it as a lay
 7   person.  Other legal fees would be included in a
 8   contingency-type arrangement where if there were
 9   successful financial recovery in a case, the firms
10   participating on that case would be eligible for
11   mechanisms by which to recoup some of their
12   expenditures and fees.
13        Q.     Any other understanding with regard to
14   legal fees?
15        A.     I'm not sure what you mean by legal
16   fees.  It could be an expansive definition in the
17   legal world, so you as a lawyer -- I'm not -- I'm
18   not -- maybe it would help if you could define
19   exactly everything that would be encompassed
20   within legal fees.
21        Q.     Well, you said some fees are paid by
22   Atlas, correct, that was your testimony?
23        A.     Yes.
24        Q.     Okay.  What legal fees are paid by
25   Atlas?
```



1  by covered persons to pursue legal action either
2  individually, collectively or as class members?
3         A.    So if you are asking does Atlas get
4  involved in discussions by covered persons who
5  wish to take their own action of whatever type
6  might be available to them?  Generally speaking,
7  no, that's not something that we would consider
8  part of our ordinary course of activities.
9         Q.    Does Atlas have any preference as to
10 whether covered persons proceeding under little
11 (i) participate individually, collectively or as
12 class members in legal actions?
13              MR. LEE:  Outside the scope.
14        A.    Our primary objective, as I mentioned,
15 is to see that the promises of Daniel's Law are
16 manifest in the real world and that these
17 individuals who are at risk and in many cases have
18 gone through, as I have -- as I have referred to a
19 few times, pretty serious incidents of threats,
20 violence, death threats, swatting, things like
21 this, that they have the tools available to them
22 that the legislature made available to them that
23 they can use to protect themselves and their
24 families.  That's one of the first principles that
25 we go back to.  So with our -- with that as the



```
 1   north star, wanting to make Daniel's Law work,
 2   make it effective, help people protect themselves,
 3   downstream of that the answer to your question
 4   would be no, I don't think we have any particular
 5   preference as to how that is achieved as long as
 6   it is achieved and that that ultimately becomes
 7   the end state, that there is a law that's followed
 8   and complied with and respected and that these
 9   individuals can benefit from the privacy,
10   security, safety protections that followed the
11   murder of the judge's son.
12        Q.    Is it fair to say then, sir, that
13   ultimately the decision how to proceed under this
14   section is up to each individual covered person,
15   in your view?
16              MR. LEE:  Before or after assignment?
17        Q.    In this particular section, little (i),
18   the non-assigned.
19        A.    So you are asking me -- sorry.  Would
20   you mind restating that.
21        Q.    Sure.  Is it fair to say that persons
22   preceding under this little (i) section, it's
23   ultimately up to each one of those individual
24   covered persons whether they want to pursue action
25   individually, collectively or in a class?
```



```
 1       Q.    I was going to ask you if it was in the
 2  ballpark.  Okay.
 3             Why were all of those ballpark 19,000
 4  assigned claims included in my lawsuit, why didn't
 5  you pick a smaller number, for example, to
 6  aggregate?
 7             MR. LEE:  Calls for a legal conclusion.
 8       Calls for speculation.  Outside the scope.
 9       A.    Our goal is to effectuate compliance
10  with the law.  I don't know why we would
11  selectively have chosen a smaller number of
12  individuals who -- to send assignment
13  confirmations to.  Our goal is to make the law
14  work and make it effective, and the litigation
15  reflects that and you see that there is uniformity
16  across the different cases that we filed.
17       Q.    But Atlas has the discretion, to use
18  the words in your terms of service, to make that
19  determination as to how many claims to aggregate;
20  correct?
21       A.    You keep using the word "aggregation."
22  I --
23       Q.    You used the word.
24             MR. LEE:  Excuse me.  Come on.  You are
25       a professional.  Please let the witness
```



```
 1        answer and then you can ask whatever you
 2        want.
 3        A.     You keep using the word "aggregation."
 4   I might use it in response to you.  I'm not sure
 5   how you are using it in each case what it means to
 6   you as a lawyer, so I am using it in that lay
 7   definition of what you might find in Webster's
 8   Dictionary on the first line, just, you know, sort
 9   of bundling something up, so I just want to point
10   that out.  Would you mind asking the question
11   again.
12        Q.     Sure.  I just wanted to know if Atlas
13   has the discretion to make that determination.
14        A.     Well, we decide -- it's our
15   responsibility to send assignment confirmations,
16   and so ultimately we are the ones who decide who
17   to send them to and how many to send.
18        Q.     And you could have decided any number
19   up from 1 to all 19 some-odd thousand; correct?
20        A.     Again, our goal is to maximize
21   compliance under the law and I don't know how --
22   it's not clear to me how selectively prosecuting
23   or selectively taking a smaller group of folks
24   would have achieved that.  If you are asking in
25   your specific case and I don't -- this is not
```



```
 1   directed at you, but -- personally obviously, but
 2   The Lifetime Value Companies is an egregious
 3   disclosure -- discloser of our covered persons'
 4   personal information, they continue to disclose
 5   information even today of covered persons, and so
 6   they are a good example of why we felt the need to
 7   do everything we could to increase the chances
 8   that compliance would be achieved and the law
 9   would be respected, and to me including more --
10   including, you know, more -- more in that action
11   is more effective than including less, so that's
12   how I would look at that.
13        Q.    Did Atlas consider filing separate
14   civil actions for each covered person whose claims
15   it says was assigned to Atlas?
16              MR. LEE:  Improper hypothetical.
17              Hold on.
18              Improper hypothetical.  Calls for
19        speculation.  Calls for a legal conclusion.
20        Litigation strategy.
21        A.    I think it would go into areas of
22   privileged discussions that we might or might not
23   have had with counsel that would be privileged.
24        Q.    Let me ask you this:  Under your terms
25   of service, Atlas could have pursued each assigned
```



1  facts and circumstances at issue in any particular
2  case.
3       Q.    By the way, if a particular lawsuit,
4  let's just say the one against my client, were not
5  to be able to be resolved, goes all the way to
6  trial, does Atlas expect to have 19,000 some-odd
7  separate trials against Lifetime Value or just one
8  trial?
9             MR. LEE:  Calls for a legal conclusion.
10      Speculation.  Lack of foundation.  Outside
11      the scope.
12      A.    I'm not a lawyer.  I can't speak to
13  litigation strategy.  I wouldn't be able to answer
14  that question.  I can tell you on a personal level
15  I hope we don't have to go to court 19,000 times,
16  but I can't answer that question.
17      Q.    Is Atlas' preference to go to trial one
18  time, if necessary?
19      A.    As I've said, our preference is to --
20  is to get folks to follow the law, to hopefully,
21  among other things, help data brokers, some of the
22  clients you all represent, understand the very
23  real threats that these individuals face, the need
24  to, again, follow the law, which is the law of the
25  land, but the need to follow the law and protect



```
 1   these individuals, help them, you know, honor
 2   their rights, honor their requests, and that being
 3   our -- one of our guiding principles, downstream
 4   of that we defer to -- obviously we have great
 5   outside counsel that we engage with discussions,
 6   we engage with them on discussions of litigation
 7   strategy, but I can tell you that the outcome --
 8   Atlas' desired outcome is simply to get -- to
 9   achieve compliance with law, to get data brokers
10   and other companies to follow the law and to
11   respect the law.
12         Q.    Why does Atlas use assignment
13   confirmations to trigger assignments rather than
14   simply tell covered persons that they can ask for
15   an assignment at the time of their choosing?
16         A.    The mechanism by which assignment
17   confirmations are provided is laid out in the
18   terms of service -- what is this -- Exhibit 4 in
19   front of me, and this document -- my understanding
20   is this document governs the contractual
21   relationship that we have with those covered
22   persons who sign up for our services and then
23   utilize those services, and this -- this terms of
24   service provides for us to send an assignment
25   confirmation, and upon the sending of that
```



```
 1   assignment confirmation, for that claim to be
 2   assigned.
 3        Q.    I understand that.  I am just asking
 4   you why you chose that method as opposed to a
 5   different method where the covered person could
 6   just decide themselves to assign the claim to you?
 7              MR. LEE:  Objection.  Improper
 8        hypothetical.  Vague.  I don't understand the
 9        question.
10        A.    I'm not sure I entirely do either.
11   Again, generally speaking, our goal is
12   compliance -- to encourage compliance with the
13   law.  Specifically we get into discussions we
14   might have had around litigation strategy, I'm not
15   sure, but those areas would be privileged.
16        Q.    If your goal is to ensure compliance
17   with the law, do you think the covered persons
18   share those goals?
19              MR. LEE:  Calls for speculation.
20              Answer if you can.
21        A.    I can't speak for all covered persons,
22   but I can tell you having spent many hundreds and
23   hundreds of hours with these -- some of these
24   individuals in New Jersey, as I mentioned earlier,
25   often in the context of very serious threats that
```



MATTHEW WILLIAM ADKISSON  30(b)(6), Confidential                   July 30, 2024
In re: Daniel's Law Compliance Litigation                                    312

```
 1      Q.    You were asked some questions about
 2   your former co-founders of Atlas.  Do you remember
 3   that?
 4      A.    I remember being asked about them, yes.
 5      Q.    Are you aware of any discussions with
 6   them by you or anyone at Atlas about subject
 7   matter jurisdiction or CAFA before these lawsuits
 8   were filed?
 9            MR. KIMREY:  Objection.  Vague.
10      A.    We never discussed subject matter
11   jurisdiction or CAFA.  I'm not aware of them
12   having those conversations with anyone else.
13      Q.    You were asked some questions about
14   Atlas members.  Do you remember those questions?
15      A.    As a topic, yes.
16      Q.    Are you aware of any discussions with
17   them by you or anyone at Atlas about subject
18   matter jurisdiction or CAFA before these lawsuits
19   were filed?
20            MR. KIMREY:  Objection.  Vague.
21      A.    No, I am not.
22      Q.    You were asked questions about the PBA
23   Local 105 and the State Troopers Fraternal
24   Association.  Do you remember that?
25      A.    I do.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        Q.    Are you aware of any discussions with
 2   them by you or anyone at Atlas about subject
 3   matter jurisdiction or CAFA before these lawsuits
 4   were filed?
 5              MR. KIMREY:  Objection.  Vague.
 6        A.    No, I am not.
 7        Q.    You were asked questions about
 8   co-founders or other partners of other companies
 9   you have been a part of.  Do you remember those
10   questions?
11        A.    I do.
12        Q.    Are you aware of any discussions with
13   them by you or anyone at Atlas about subject
14   matter jurisdiction or CAFA before these lawsuits
15   were filed?
16              MR. KIMREY:  Same objection.
17        A.    No.
18        Q.    You were asked questions about
19   employees or partners of Atlas.  Do you remember
20   those questions?
21        A.    I do.
22        Q.    Are you aware of any discussions with
23   them by you or anyone at Atlas about subject
24   matter jurisdiction or CAFA before these lawsuits
25   were filed?
```



```
 1                  MR. KIMREY:  Objection.  Vague.
 2        A.   No, I am not.
 3        Q.   Prior to the lawsuits being filed, did
 4   you know what subject matter jurisdiction is?
 5        A.   I did not.
 6        Q.   Prior to the lawsuits being filed, did
 7   you know what CAFA is?
 8        A.   I did not.
 9        Q.   Does Atlas care whether these cases,
10   the 142 cases that we have been talking about, are
11   in New Jersey federal court or state court?
12        A.   We do not.
13        Q.   And can you tell us, just in closing,
14   what does Atlas do?
15        A.   Someone had asked this question
16   earlier, I forget who it was, and I think in my
17   request for clarification they asked --
18                  MR. KIMREY:  Objection.  Calls for a
19        narrative.  Beyond the scope.
20        A.   -- what Atlas meant to me when it was
21   incorporated, and I can tell you what Atlas means
22   to me now.  In two words I would say public
23   service.  I was asked about my personal
24   background.  My family's background is one of
25   public service to the country.  Both of my
```



```
 1                    C E R T I F I C A T E
 2
 3   STATE OF NEW YORK    )
 4                        ) ss.:
 5   COUNTY OF NASSAU     )
 6
 7              I, KRISTIN KOCH, a Notary Public
 8       within and for the State of New York, do
 9       hereby certify:
10              That MATTHEW WILLIAM ADKISSON, the
11       witness whose deposition is hereinbefore
12       set forth, was duly sworn by me and that
13       such deposition is a true record of the
14       testimony given by such witness.
15              I further certify that I am not
16       related to any of the parties to this
17       action by blood or marriage; and that I am
18       in no way interested in the outcome of this
19       matter.
20              IN WITNESS WHEREOF, I have hereunto
21       set my hand this 5th day of August, 2024.
22
23
24
25                   KRISTIN KOCH, RPR, RMR, CRR
```

